**EXXON CORPORATION et al., Petitioners,**

v.

**Triphene MIDDLETON et al., Respondents.**

No. B–7979.

Supreme Court of Texas.

Feb. 4, 1981.

Rehearing Denied March 11, 1981.

Baker & Botts, Frank G. Harmon, Walter B. Morgan and Louis Bagwell, Houston, Orgain, Bell & Tucker, John G. Tucker, Beaumont, Herf M. Weinert and Julius L. Lybrand, Dallas, for petitioners.

Bracewell & Patterson, William Key Wilde and Charles G. King, Houston, for respondents.

## ON MOTION FOR REHEARING

CAMPBELL, Justice.

Our opinion and judgment dated October 1, 1980, are withdrawn and set aside.

Exxon Corporation, formerly Humble Oil and Refining Company, (Exxon) secured three oil and gas leases from A. D. Middleton in 1933 and 1934 and one lease from members of the White family in 1935. Sun Oil Company of Delaware (Sun) obtained two oil and gas leases from A. D. Middleton and others in 1940 and 1941, one lease from R. M. White in 1933, one lease from Lily Mae Hamilton and O. B. Hamilton in 1933, and two leases from Felix Jackson and others in 1933 and 1938.

Three lawsuits involving these leases were filed in 1974. The first was by the successors in interest to A. D. Middleton (Middletons) against Exxon. The second was by the successors in interest to R. M. White (Whites) against Exxon and Sun. The third was brought by the successors in interest to Felix Jackson (Jacksons) against Sun. These separate suits alleged a deficiency in the amount of royalties paid by Exxon and Sun, as lessees, for the years 1973, 1974 and 1975. The three original lawsuits were consolidated into a single suit, which was tried to the court in January of 1977, and judgment was rendered for the plaintiffs. The Court of Civil Appeals reversed the trial court judgment and remanded the cause in part and rendered judgment in part. 571 S.W.2d 349, Tex.Civ. App.

The problem begins with the gas royalty clause. That clause in the Exxon lease with the Middletons and Whites provides that royalties

... on gas, including casinghead gas or other gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, shall be the market value at the well of one-eighth of the gas so sold or used, provided that on gas so sold at the wells the royalties shall

be one-eighth of the amount realized from such sale.

The gas royalty clause in the Sun-Middleton, White and Jackson leases provides that Sun would pay

> ... on gas, including casinghead gas or other gaseous substances, produced from said land and sold or used off the premises, or used in the manufacture of gasoline or other products therefrom, by lessee, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells, the royalty shall be one-eighth of the amount realized from such sale.

The first question is "What is a sale at the wells?" or "What is a sale off the premises?" The Exxon leases are located in the Anahuac Field, Chambers County. Some of the natural gas produced from the Middleton and White leases was processed at Exxon's Anahuac Gas Plant. This plant is not located on any of the Middleton or White leases but is in the Anahuac Field. The processed gas was delivered by Exxon at the tailgate of its Anahuac Gas Plant to the City of Anahuac, the Houston Pipeline Company and the Exxon Gas System. Twenty percent of the processed gas was sold to the City of Anahuac and the Houston Pipeline Company. The remainder was delivered to the Exxon Gas System and was sold to Exxon's "eastend customers," and is marketed to fifteen industrial customers. The Exxon Gas System delivered gas to each eastend customer at the customer's "plant gate."

The distinction between "sold or used off the premises" or "sold at the wells" now becomes important because the oil and gas royalty clause provides two standards for computing royalties, market value and amount realized. The royalty clause provides

> [1] ... on gas ... sold or used off the premises ... the market value at the well of one-eighth of the gas so sold or used.

The clause further provides

> [2] ... that on gas sold at the wells the royalties shall be one-eighth of the amount realized from such sale ....

The parties agree that on gas "sold at the wells" royalties are based on the amount realized.

Exxon argues that its sale to the City of Anahuac and Houston Pipeline Company at the tailgate of the Anahuac Plant, not located on the Middleton or White leases, but within the Anahuac Field is a sale at the wells. Therefore, the royalties should be based on the amount realized from such sales. The Middletons and Whites argue that the Anahuac Plant is not on the leased premises and the royalties should be based on market value because a sale off the leased premises is not a "sale at the wells."

Stated another way, the issue with regard to Exxon's sales to Houston Pipeline Company and the City of Anahuac is whether a sale in the field, but not on the premises of the lease, is a sale "off the premises" or a sale "at the wells." If the former, the royalty is calculable on the basis of market value; if the latter, the royalty is payable on the basis of the proceeds received by Exxon for the sale of that gas.

The trial court found Exxon's sales to Houston Pipeline Company and the City of Anahuac at the tailgate of the Anahuac Gas Plant were "sales at the wells." The Court of Civil Appeals reversed that finding and held that gas sold at the tailgate of the Anahuac Gas Plant were sales "off the premises."

The court stated:

> The court's finding that the gas was sold at the tailgate of the Anahuac Gas Plant is inconsistent with, and better supported by the evidence than the finding that the gas was "sold at the wells."

It is undisputed that "off the premises" means off the leased premises. However, the question is whether the boundary lines of the leased premises determines which

royalty clause is applicable, market value or amount realized.

The market value provision of the royalty clause stated:

> ... on gas ... *sold or used off the premises* ... the market value at the well of one-eighth of the gas so sold or used.

The Whites and Middletons argue this clause provides royalties based on market value for all gas sold off the leased premises and based on the amount realized for all gas sold within the leased premises (sold at the wells). They argue that in the phrase "sold or used off the premises" off the premises modifies both "sold" and "used." Because the market value standard includes all sales off the leased premises, they contend that, by implication, the phrase "sold at the wells" includes all sales which occur "on the premises."

Exxon contends that "off the premises" modifies the word "used" only. It contends the phrase "sold at the wells" is neither defined nor limited by any language in the lease, and that the parties intended a sale at the well to include any sale which occurred in the field of production.

Exxon's contention that the words "off the premises" modifies the word "used" and not the word "sold" is weakened by looking at the entire clause.

> ... on gas ... sold or used off the premises ... the market value at the well of one-eighth of the gas *so sold* or used.

The words "so sold" imply the gas has been sold in a certain manner. In Webster's Third International Dictionary, "so" is defined as "in a manner or way that is indicated or suggested." If, as Exxon insists, "off the premises" modifies the word "used" only, parallel construction would rewrite the phrase to provide a royalty calculated on "the market value at the well of one-eighth of the gas sold or so used."

Exxon's construction creates royalty standards which overlap. According to Exxon, the market value standard applies to all sales wherever they occur, whereas, the amount realized standard applies only to sales at the wells even though sales at the wells are covered by the market value standard. Exxon's construction would cause the royalty clause to read as follows:

> On gas ... produced from said land and *sold* ... the market value at the well of one-eighth of the gas so *sold* provided that on gas *sold* at the wells the royalty shall be one-eighth of the amount realized.

We conclude "off the premises" modifies both "sold" and "used." The "premises" is the land described in the lease agreement. Therefore, sold "off the premises" means gas which is sold outside the leased premises. Thus, "sold at the wells" means sold at the wells within the lease, and not sold at the wells within the fields.

Our construction in no way conflicts with *Texas Oil and Gas Corporation v. Vela*, 429 S.W.2d 866 (Tex.1968). In *Vela*, the royalty clause obligated Texas Oil and Gas:

> To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being *sold or used off the premises*, one-eighth of the market price at the wells of the amount so sold or used, ... (emphasis added).

Gas produced from the Vela leases was sold on the leased premises. The sole standard for calculating royalties was market value, regardless of where the sale took place. Under those circumstances the phrase "off the premises" did not modify sold, and the words "so sold" as used in that context referred to all sales.

Exxon relies heavily on *Butler v. Exxon Corporation*, 559 S.W.2d 410 (Tex.Civ.App. —El Paso 1977, writ ref'd n. r. e.). In *Butler, supra,* the royalty clause is almost

identical to the one in issue.[1] Gas produced from the Butler leases was sold off the leased premises, but within the field of production. The trial court interpreted the phrase "sold at the wells" to include sales which occurred anywhere in the vicinity of the field and found the gas sold from the Butler leases was "sold at the wells." The Court of Civil Appeals expressly approved this finding. It noted the parties did not use mutually exclusive terms such as "on the premises" and "off the premises" or "at the well" and "away from the well," and that the clause based on "amount realized" from a sale "at the well" had no limiting language requiring the sale to be "on the premises." The court relied primarily on expert testimony about what constituted a "sale at the well" as understood in the oil and gas industry. To the extent the Court of Civil Appeals' interpretation of the royalty clause in *Butler, supra,* conflicts with our interpretation of this clause, it is disapproved.

In *Skaggs v. Heard,* 172 F.Supp. 813 (D.C. Tex.1959), it was held, under a gas royalty clause, that a sale at a separator on the leased premises, but 320 feet from a wellhead, was a sale "at the well" as opposed to being a sale not at the well and off the leased premises. Also, in *Kingery v. Continental Oil Company,* 434 F.Supp. 349 (D.C. 1977), the Court, in construing a gas royalty provision similar to the one in question, held that a sale off the premises was not a sale at the wells. In that case the point of delivery was located off the premises approximately 3½ miles from the nearest line of the leased premises.

Having determined that Exxon must pay royalties based on the market value of all the gas sold off the White and Middleton leases, we turn to the question of *when* and *how* market value is determined.

## MARKET VALUE

■ All parties agree market value is determined when the gas is sold. The problem is "when is it sold." Before 1972, most natural gas was marketed under long-term contracts at fixed prices. Exxon contends the date its gas contracts became effective is the time the gas is sold and therefore the time market value is determined. Relying on our decision in *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866 (Tex.1968), the Court of Civil Appeals rejected this contention and held that Exxon must pay royalties of one-eighth of the market value of the gas when *delivered,* and not the market value when Exxon's gas contracts became effective.

Exxon argues *Vela, supra,* is distinguishable because the language of the *Vela* royalty clause supports the position that the parties intended market value to be determined when the gas was delivered to the purchaser. That clause provided that a royalty equal to one-eighth of the market value at the wells would be paid on gas produced on the lessor's land "while the same is being sold or used off the premises." Exxon insists no such intention can be ascertained from the language of the White and Middleton royalty clause. We disagree.

Under the express terms of the clause, for royalty to become payable, gas must be "*produced* from said land and sold or used off the premises . . . ." Production means actual physical extraction of the mineral from the land. *Monsanto Co. v. Tyrrell,* 537 S.W.2d 135 (Tex.Civ.App.—Houston 1976, writ ref'd n. r. e.). Under the royalty clause, production of gas is a prerequisite to its sale or use. The gas purchase contracts became effective *before* the gas was produced and sold. The clause also employs the words "sold" and "used" in the same tense. Gas is "used" when delivered or consumed. The time gas is "sold" is the

---

1. (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; . . .

same time gas is "used"—when it is delivered. Because Exxon must pay royalties based on market value for gas "used off the premises," that same royalty clause cannot permit Exxon to pay royalties on "gas sold off the premises" on any basis other than its market value when delivered. The wording of the royalty clause, therefore, negates the idea of a sale of gas on the effective date of a gas contract for royalty purposes. Just as gas was "being sold" when delivered to the gas purchasers in *Vela*, so was gas "sold" when delivered by Exxon to its customers.

Exxon insists the practicalities of the natural gas industry require us to construe "sold" to mean the time the gas becomes committed to a bona fide long-term gas contract. We are not unmindful of the realities of the gas industry; however, our resolution of this problem is based upon the recognition of two separate and distinct transactions, the lease agreement and the gas contract. Although as between Exxon and its customers, the gas may have been sold when the contracts became effective,[2] there is no basis in the royalty clause for applying such a definition to the lease agreements. Exxon's royalty obligations are determined from lease agreements which were executed prior to and wholly independent of the gas contracts. *Vela, supra.* When Exxon negotiated the gas contracts, it took the risk that the revenue therefrom would be sufficient to satisfy its royalty obligations. That subsequent increases in market value have made these obligations financially burdensome is no reason to compel this Court to disregard the plain and unambiguous terms of the royalty clause and rewrite it to conform to the meaning that Exxon, as drafter of the language, says was intended. *See Foster v. Atlantic Refining Company*, 329 F.2d 485 (5th Cir. 1964). Exxon's royalty obligations are fixed and unaffected by its gas contracts. If the parties intended royalties to

be calculated on the amount realized standard, they could and should have used *only* a "proceeds-type" clause.

[The lessees] might have agreed that the royalty on gas produced from a gas well would be a fractional part of the *amount realized* by the lessee from its sale. Instead of doing so, however, they stipulated in plain terms that the lessee would pay one-eighth of the market value at the well of all gas sold or used off the premises. This clearly means the prevailing market price at the time of the sale or use. *Vela, supra*, at 871. (emphasis added)

The parties did not use "market value" and "amount realized" interchangeably and we reject Exxon's assertion that the parties intended "market value" to have essentially the same meaning as "amount realized."

It is clear then that the parties knew how to and did provide for royalties . . . based upon . . . market value, and based upon the proceeds derived by the lessee from the sale of gas. *Vela, supra.*

■ We now turn to the question of *how* the market value is determined.

In Texas, a gas pipeline purchaser is required each month to file a Purchaser's Monthly Gas Tax Report with the State Comptroller of Public Accounts. These reports, commonly called "Form 60–150's" contain the name of the purchaser and seller; the month and year of each purchase; the lease and county from which the gas was produced; the quality of the gas or whether it is produced from an oil well or gas well; the volume purchased; and the price. The Middleton's expert, Mr. William S. Hudson, reviewed over 30,000 of these reports to arrive at an opinion of market value. He considered the relevant market area for the gas sold from the White and Middleton leases to be Texas Railroad Commission Districts (TRC) 2, 3, and 4.[3] He

---

2. *But see Martin v. Amis*, 288 S.W. 431 (Tex. Com.App.1926, jdgm't adopted).

3. These districts, in effect, comprise the entire Texas Gulf Coast. According to Hudson, this

area meets the requisites of a relevant market area in that gas supply and production, industrial demand and consumption are present in this area.

arrived at his opinion by taking the arithmetical average of the three highest prices paid from quarter to quarter for any quantity of gas anywhere in the relevant market area.

Exxon's expert, Mr. Frederick M. Perkins, testified that Exxon's "field price" was the market value of the gas. Exxon's "field price" for the Anahuac Field is computed from sales in TRC #3 plus the seven adjoining counties of Lavaca, Jackson, Milam, Robertson, Angelina, San Augustine, and Sabine. The field price is calculated by taking the total price paid for one month in each quarter for the gas currently delivered to all major purchasers and dividing it by the total volume of gas delivered.

The trial court determined market value based on Mr. Hudson's expert opinion testimony. The Court of Civil Appeals disagreed. It held the method used by Hudson failed to satisfy the requirements for determining market value as set forth in *Vela, supra* : [4]

> Hudson did not define the relevant market area as the Anahuac Field. He refused to give weight to any contracts for sale of gas from this field. The sales that he considered were not shown to be comparable in time, quality and availability to marketing outlets. He selected only the highest prices paid in TRC Districts 2, 3 and 4 that satisfied his criteria. He made no mathematical average of all prices paid in the field, nor did he seek to corroborate such an average with comparable sales as defined by the supreme court. His consideration of price data

compiled on a quarterly, rather than monthly, basis is inconsistent with the time period at issue in the case.

The Court of Civil Appeals also rejected Exxon's contention that its "field price" conclusively established the market value of the gas because the "field price" is computed in part on the basis of sales of gas in interstate commerce. The parties stipulated that during the years 1973–1975 all of the gas from these leases was sold in intrastate markets in Texas.

 Market value is defined as the price property would bring when it is offered for sale by one who desires, but is *not obligated to sell,* and is bought by one who is under no necessity of buying it. *Polk County v. Tenneco, Inc.,* 554 S.W.2d 918 (Tex.1977). To determine the market value of gas, the gas should be valued as though it is free and available for sale.

 Market value may be calculated by using comparable sales. Comparable sales of gas are those comparable in time, quality, quantity, and availability of marketing outlets. *Vela, supra.*

Sales comparable in time occur under contracts executed contemporaneously with the sale of the gas in question. Sales comparable in quality are those of similar physical properties such as sweet, sour, or casinghead gas. Quality also involves the legal characteristics of the gas; that is, whether it is sold in a regulated or unregulated market, or in one particular category of a regulated market.[5] Sales comparable in

---

4. From *Vela,* the Court of Civil Appeals drew the following conclusions:

(1) the relevant marketing area is the field in which the gas was produced; (2) the market price of gas is to be determined by reference to sales of gas comparable in time, quality and availability to marketing outlets; (3) the mathematical average of all prices paid in the field is not a final answer to determining market value price at any particular time; (4) the relevant period of time to be used in determining the amount that should have been paid to the royalty owners is the specif-

ic period in question; and (5) an expert's opinion based upon a mathematical average of prices paid in the field and corroborated by comparable sales from the field during the relevant period may afford a basis for determining market price.

5. Although none of the gas involved in this case during the period in question was sold in a regulated market, all of the gas production in question is subject to the ceiling price restrictions established by the Natural Gas Policy Act of 1978.

quantity are those of similar volumes to the gas in question. To be comparable, the sales must be made from an area with marketing outlets similar to the gas in question. Gas from fields with outlets to interstate markets only, for instance, would not be comparable to gas from a field with outlets only to the intrastate market.

Comparable sales should be drawn from a relevant market. The Court of Civil Appeals interpreted our decision in *Vela* to mean that the relevant market must be the field from which the gas is produced. In *Vela*, the plaintiff's expert determined market value by analyzing comparable sales from the field of production. Although the field was used as the relevant market, this Court did not hold that the relevant market is confined to the field. Rather we held it was proper, not necessary, for the trial court to consider the expert's testimony on market value and that the evidence of the expert supported the finding of the trial court.

The size of a relevant market depends on the facts in each case. Mr. Hudson testified that Texas Railroad Commission Districts (TRC) 2, 3, and 4 was the relevant market. He testified that within this area sales comparable in time, quality, quantity, and availability of marketing outlets occurred. He also testified that gas production, facilities for gathering and transporting gas, and consumption of gas were present in this area.

Mr. Hudson's testimony was substantially corroborated by the testimony of Sun's expert, Mr. H. J. Gruy. Moreover, there was testimony that price redetermination clauses of many gas purchase contracts use TRC #2, 3, and 4 as the relevant market for gas produced along the Gulf Coast. We hold there was some competent testimony to support the trial court's finding of TRC #2, 3 and 4 as the relevant market. Applying the test of comparability to the market value formula urged by the parties, we hold that Mr. Hudson's testimony is competent testimony which supports the trial court's determination of market value.

The sales used by Mr. Hudson are comparable in quality. He testified that most of the gas produced within the relevant market is sweet gas. Mr. Gruy and Mr. Perkins also testified that the quality of gas in TRC #2, 3 and 4 was comparable. The Gas Purchaser Reports show that most of the sales used by Mr. Hudson were sales of sweet gas. Moreover, Mr. Hudson adjusted the sales he used according to the btu content of the gas to make them comparable. Also, the sales used were intrastate sales, and therefore comparable in legal quality.

Although he used sales of varying volumes, Mr. Hudson testified that during 1973, 1974, and 1975 in TRC #2, 3, and 4, the price of gas was comparable regardless of the volumes sold. Mr. Perkins testified that during the period in question quantity did not make any difference. Mr. Hudson testified if one knew the btu value of the gas and made the necessary adjustments, that sales could be made comparable regardless of quantity.

The sales used by Mr. Hudson are comparable in their availability to marketing outlets. He testified the gas fields in TRC #2, 3, and 4 are interconnected through a great network of pipelines, both intrastate and interstate.

The sales used by Mr. Hudson are comparable in time. The parties stipulated that the market value of the gas was to be determined quarterly. Mr. Hudson selected the three highest prices for the first month of each quarter, made btu adjustments, averaged them arithmetically, and determined the market value for that quarter. The three highest prices were used because gas prices were increasing and if you wanted the most current price you would look at the highest prices because they represented the most recent transactions. Mr. Hudson also stated that most gas purchasers set their initial price or redetermined price by taking the highest prices in the area.

Exxon argues that Mr. Hudson's method is flawed because it, in effect, values the gas as if it were free and available for sale each quarter. Exxon insists the gas was committed to the performance of its gas contracts and, therefore, the sales used by Mr. Hudson were not comparable. The terms of a gas contract between Exxon and a third party will not lessen Exxon's duty to pay royalties based on market value. We hold the trial court did not err in valuing the gas as if it were free and available for sale.

Exxon's "field price" fails to establish conclusively the market value. The sales used in its computation were not comparable in quality. All gas produced from the White and Middleton leases was sold within the State. Exxon's field price, however, includes interstate sales. Intrastate and interstate gas prices are not comparable in quality. They are conceptually and legally different. The price of interstate gas during the period in question was regulated by the Federal Power Commission ("FPC"). While this evidence may be admissible, such evidence does not bind the fact finder as a matter of law in its determination of market value.

Moreover, Exxon's "new vintage gas" concept supports our holding that its "field price" was not binding on the trial court in its determination of the market value of gas produced from the White and Middleton leases. Exxon treats gas discovered and produced after January 1, 1972, as new vintage gas and computes the royalty on this gas in a manner completely different from its field price.[6] In fact, the formula used by Exxon for calculating royalties on new vintage gas is remarkably similar to Mr. Hudson's market value formula. Market value for Exxon's new vintage gas is determined, by Exxon, by taking the arithmetic average of the three highest prices paid by a pipeline for sales over one million

cubic feet per day, with adjustments for btu content. In 1962, Sun, through arbitration, agreed the representative prices to be submitted to arbitrators were the three highest prices paid in Railroad Commission District 3. When Sun's agreement with Amoco ended it sold gas to United Texas Transmission Co. pursuant to a negotiated agreement that contained a price redetermination provision pursuant to which Sun sells its gas for the arithmetic average of the three highest prices paid for gas in Railroad Commission Districts 2, 3 and 4. This was almost the same method used by the trial court.

Sun's expert, Buford Koehler, testified "I wouldn't have too much quarrel about his method here to determine the three highest prices paid for it for the purposes of redetermining under the contract."

Exxon's methods of calculating royalties reflect one market value for gas produced from wells discovered before January 1, 1972 and another market value for gas discovered and produced after that date. This distinction is inconsistent with our holdings that under the White and Middleton royalty clause gas is sold when delivered and market value is determined from sales comparable in time, quantity, quality, and availability of markets. The determination of market value is not dependent on when the gas is discovered.

The Court of Civil Appeals criticized Hudson's method because he made no mathematical average of all prices paid in the field nor did he seek to corroborate such an average with comparable sales. We do not share the Court of Civil Appeals' views on this point. We specifically stated in *Vela, supra,* that a mathematical average of all prices paid in the field is "not a final answer to the difficult problem of determining market value at any particular time."

---

**6.** Mr. Perkins testified the market value of new vintage gas was determined by computing the arithmetic average of the three highest prices paid by a pipeline for sales of more than one million cubic feet of gas per day in Railroad Commission Districts 1 through 6, adjusted to reflect the heating capacity (btu content) of that gas.

The complexity of the oil and gas industry makes it difficult to establish a formula to determine the market value of gas in each field in Texas. The market value of gas may be established by expert testimony. Once experts qualify, their testimony is to be considered by the fact finder. Objections to the basis of their testimony goes to its weight, not to its admissibility. *Weymouth v. Colorado Interstate Gas Company*, 367 F.2d 84 (5th Cir. 1966). In *Weymouth, supra,* the lessors asserted that the lessees' experts based their opinion of market value on sales which were not comparable. The Fifth Circuit rejected the lessors' attempts to confine the experts' testimony to sales of exact comparability:

> This view is too restrictive for the situation of an expert witness explaining his opinion. Lessors' heavy reliance on the *Sartor* cases would bind upon us and all experts the rules applicable to introduction of direct evidence of comparable sales. This is simply unrealistic where we deal with an expert who, once he establishes his qualifications and he gives his broad, general opinion, needs to be able to reveal the basis for his opinion in his own language without too many communication-crippling legal barriers thrown in his way. 367 F.2d at 91.

The lessees' experts testified that the prices they utilized were fairly comparable. The court held that objections against uncomparable sales went only to the weight which the fact finder should attach to the experts' opinion. We hold there was some evidence to support the trial court's determination of market value.

## SUN OIL COMPANY'S DIVISION ORDERS

■ The leases between the Middletons, Whites and Jacksons (royalty owners) and Sun were executed during the years 1933 through 1941.

Except for gas produced from the R. M. White lease,[7] the gas produced from the Sun leases was processed off the lease premises at Union Texas Petroleum's Winnie Plant. During the years 1973, 1974, and 1975, gas was delivered by Sun to Pan American Gas Company, a predecessor of Amoco Gas Company, at the tailgate of the Winnie Plant pursuant to a gas contract dated July 5, 1951, and amended July 22, 1965. The price paid by Pan American under the contract was 17.58¢. Sun calculated and paid royalties to the royalty owners on the contract price. The royalty owners contend the royalties were payable on the market value at the well of the gas.

The gas royalty clause of these leases is identical and obligates Sun to pay:

> . . . on gas, including casinghead gas or other gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that *on gas sold at the wells* the royalties shall be one-eighth of the amount realized from such sale . . . . (emphasis added).

Because the gas is sold off the leased premises, Sun was obligated to pay one-eighth of the market value of the gas. Instead, Sun calculated and paid royalty to the lessors on the amount realized. The payment of royalties calculated on the amount realized was at all times during the period in question in conformity with certain documents, denominated "division orders," executed by the royalty owners or their predecessors in 1952. These documents were directed to Sun as operator of the leases, and in effect, changed the basis of the royalty standards of the leases. The documents also provided for the monthly payment of royalties, and required Sun to make available charts and records at all reasonable times. Finally, the

---

7. The royalties payable on the R. M. White lease are not before this Court.

documents stated they were binding on all parties, their heirs, successors, and assigns, and would remain in force during the life of the respective leases. The documents did not refer to any specific gas contracts executed by Sun.

The trial court found the "division orders" did not amend the leases to provide for royalties payable on proceeds. The trial court considered the division orders revocable, and found they were, in fact, revoked by the royalty owners on March 30, 1974, the date their petitions were served on Sun. The trial court concluded that the payments made by Sun and accepted by the royalty owners prior to March 30, 1974, were made pursuant to agreements supported by consideration and therefore, binding. However, the trial court also found that payments made and accepted after March 30, 1974, were not supported by consideration and therefore were not binding.

Thus, the trial court held the royalty owners were entitled to judgment for the difference between the royalty paid and one-eighth of the market value of the gas produced from the leases only from and after March 30, 1974.

The Court of Civil Appeals held the "division orders" were valid written agreements modifying the gas royalty clause, were supported by consideration before and after March 30, 1974, and were irrevocable.

Sun argues the trial court correctly held, under well-settled law that these instruments were binding for the time the parties acted under them. We agree.

After this Court's decision in *Chicago Corporation v. Wall*, 156 Tex. 217, 293 S.W.2d 844 (1956), the Texas law has been that payments made and accepted under an agreement such as these were effective until the agreement was revoked. *See* R. HEMINGWAY, THE LAW OF OIL & GAS § 7.5 (1971).

Federal courts, have on a number of occasions, been required to apply Texas law in division order cases. *Phillips Petroleum Company v. Williams*, 158 F.2d 723 (5th Cir. 1946), is particularly applicable, wherein the Court held:

As to contention one, the division and transfer orders, with their definite declaration that the market value of the gas at the mouth of the well is to be the measure of lessors' rights and lessee's obligations, and their clear and full provisions for precisely arriving at the value, we agree with defendant, that, until withdrawn or modified, they constitute the precise and definite basis for payments, and payments made in accordance with them are final and binding. The very existence of this and the other numerous other litigations which have arisen over the meaning and effect of market price or rate provisions and over what was the market price or value of the gas, and the fact that these agreements fix, as due, sums which may from time to time be more or less than the prevailing market price, give full support to and make binding payments and settlements thereunder. Binding as they are, however, in respect of payments made and accepted under them, these division or transfer orders did not rewrite or supplant the lease contract. They are binding only for the time and to the extent that they have been, or are being acted on and made the basis of settlements and payments and from the time that notice is given that settlements will not be made on the basis provided in them, they cease to be binding.

In *Pan American Petroleum Corporation v. Long*, 340 F.2d 211 (5th Cir. 1964), the Court held that a division order, whether called a contract or not, until revoked, is binding on the parties. In *J. M. Huber Corporation v. Denman*, 367 F.2d 104 (5th Cir. 1966), the Court, referring to division orders similar to these, held "they do, of course, constitute a precise and definite basis for payments so that payments made in accordance with them are final and bind-

ing," and cited this Court's opinion in *Chicago Corp. v. Wall, supra,* as one of its authorities for this holding.

## MIDDLETONS' AND WHITES' DIVISION ORDERS

Our holding on Sun's division orders applies to Exxon's division orders executed by Middletons and Whites. We hold as a matter of law the division orders were revoked on *March 29, 1974,* when these royalty owners served Exxon with copies of their pleadings.[8]

## "GAS SOLD ON THE UNIT"

■ Portions of the Middleton leases belong to the Anahuac Main Frio Gas Unit No. 1. Gas produced from this unit is sold at the Anahuac Gas Plant which is located within the boundaries of Unit No. 1.

Amici Curiae argue that we should hold, as a matter of law, that gas sold anywhere within Unit No. 1 is a sale at the well because the creation of a unit obliterates all lease lines and that the unit becomes, in effect, one "amalgamated" lease. The unit lines rather than the lease lines limit or define the scope of each royalty standard. This argument ignores the express wording of the Unit No. 1 Agreement.

Article 3.4 which deals with the effect of the Agreement provides:

Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area, or production from any part of the Unitized Formation, *except for the purpose of determining payments to Royalty Owners,* shall be considered as operations upon or production from each Tract, and such operations or production shall continue in effect each lease or term royalty or term mineral interest as to all of the lands covered thereby just as if such operations had been conducted and a well

had been drilled on and was producing from each Tract.

Article 8 provides:

For the purpose of determining the royalties to which Royalty Owners are entitled on the gas produced from the Unitized Formation, the following method shall be used, to-wit:

\* \* \* \* \* \*

The volume of gas from said Tracts remaining and not used for injection operations, lost or used in handling or consumed or lost in plant operations in connection with extraction of liquids or liquid hydrocarbons therefrom or flared, shall be deemed to be dissolved gas to the extent of the total volume of dissolved gas produced from said Unitized Formation from all Tracts after deducting from such total dissolved gas produced a. volume equal to the calculated volume of dissolved gas which was used or consumed in plant operations; and the remainder of said volume of gas so remaining, if any, shall be deemed to be free gas. The total dissolved gas so remaining shall be prorated among and deemed attributable to each Tract in the Unit Area in the ratio or production that the dissolved gas produced from such Tract bears to the total dissolved gas produced from all such Tracts. In like manner, the total free gas, if any, so remaining shall be apportioned among and allocated to the several Tracts within the Unit Area in accordance with the respective Tract Participations effective hereunder. From the gas so attributable to each Tract, there shall be deducted the volume of gas returned to the Tract for operations thereon or supplied to the Lessor *under the terms of the lease covering such Tract*; and after all such computations and deductions have been accomplished, settlement shall be made for *royalties on the remaining volume of gas, or so much thereof as if sold or used off the premis-*

---

8. We should not be understood as holding that the execution of division orders would prevent relief from fraud, accident or mistake or preclude the correction of mathematical calcula-tions. Nor do we in any way indicate that relief could not be obtained from unusual or unfair provisions imposed by a party having a superior bargaining power or position.

*es, in accordance with the terms and provisions of each lease or other instrument creating Royalty Owners' interests.* (emphasis added)

We construe these provisions to mean that in determining each lessee's royalty obligation the terms of the leases are considered. Under the Middleton leases, the scope of each royalty standard is determined by the lease lines. The Unit Agreement does not substitute the Unit lines for the lease lines. Article 8, in fact, expressly provides that the gas attributable to each unitized tract shall for royalty purposes be considered as sold or used off the premises.

## PREJUDGMENT INTEREST

■ Exxon contends the trial court erred in awarding prejudgment interest on the difference between the amount of royalties paid the Whites and Middletons and the amount which should have been paid. Exon argues that a gas royalty dispute is not a proper case for an award of prejudgment interest because the market value standard does not provide a measure of ascertaining a sum payable at a date certain.

This Court held in *Black Lake Pipeline Co. v. Union Construction Co.*, 538 S.W.2d 80 (Tex.1976), that prejudgment interest is recoverable when damages are established at a definite time and the amount of damages is definitely determinable.

Here, the damages are established at a definite time. However, the problem is that the amount of damages was not definitely determinable. In view of the uncertainty that has existed in the oil and gas industry with respect to the method of determining market value of oil and gas, we hold that prejudgment interest is not recoverable in this case.

## FACTUAL INSUFFICIENCY

■ Both Exxon and Sun urge points in the Court of Civil Appeals which complain that the evidence is factually insufficient to support the trial court's determination of market value. The Court of Civil Appeals did not rule on these points. Because these factual insufficiency points are within the exclusive jurisdiction of the Court of Civil Appeals, we remand the cause to that court for determination of the points. *Custom Leasing, Inc. v. Texas Bank & Trust Company of Dallas*, 491 S.W.2d 869 (Tex.1973).

## JUDGMENT

### A. *EXXON CORPORATION.*

That part of the judgment of the Court of Civil Appeals holding that Exxon is liable to the Middletons and Whites for the difference in the royalties paid based on amount realized and the royalties due based on market value prior to March 29, 1974 is reversed.

That part of the judgment of the Court of Civil Appeals holding that plaintiffs failed to prove the market value of the gas sold from the White, Middleton, and Jackson leases is reversed and the cause is remanded to the Court of Civil Appeals to determine the insufficient evidence points presented to the Court of Civil Appeals. The insufficient evidence points of error shall be considered only to evidence of market value of gas after March 29, 1974.

That part of the judgment of the Court of Civil Appeals holding that the division orders executed by the Whites and Middletons do not vary Exxon's royalty obligation under the gas royalty clause of the lease agreements prior to March 29, 1974, is reversed.

### B. *SUN.*

That part of the judgment of the Court of Civil Appeals holding that the Whites, Middletons, and Jacksons take nothing in their actions against Sun is reversed and the cause is remanded to the Court of Civil Appeals to consider the insufficient evidence points.

The cause is remanded to the Court of Civil Appeals to enter judgment in accordance with this opinion.

The motions for rehearing on behalf of Exxon and Sun Oil Company are granted. The motion for rehearing on behalf of Triphene Middleton et al. is overruled.