# Supreme Court of Texas

---

No. 24-1033

---

Fasken Oil and Ranch, Ltd., Fasken Land and Minerals, Ltd., and Fasken Management, LLC, as General Partner of Fasken Oil and Ranch, Ltd., and Fasken Land and Minerals, Ltd.,

*Petitioners*,

v.

Baldomero A. Puig, III, Emily P. Kenna, James W. Puig, and Priscilla P. Oberton,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

---

**Argued March 3, 2026**

JUSTICE BLAND delivered the opinion of the Court.

We are once again asked to determine whether to calculate a "free of cost" royalty interest based on gas produced at the wellhead or gas processed and sold downstream. Unless the parties agree otherwise, a cost-free royalty on produced minerals is calculated free of exploration and production costs, but it bears costs incurred to enhance and transport the raw minerals for downstream sale. Parties can deviate

from this rule with language reflecting a royalty calculated on the enhanced, downstream products or language that adds postproduction costs to the base royalty.[1]

The operators historically valued the royalty interest at issue in this case at the well. Thus, the operators deduct postproduction costs from the sales price obtained at market downstream to arrive at the value of the raw minerals produced at the well. In 2021, the royalty owners challenged this practice, contending the royalty instead is based on a downstream sales price for processed gas. The trial court ruled for the royalty owners, but it granted the operators permission to appeal. The court of appeals accepted the appeal and affirmed.

We reverse. By its plain language, the deed reserves a royalty on minerals "produced from the above described acreage," not a royalty on minerals transported, processed, or otherwise enhanced for sale at an unspecified downstream point. The deed lacks language indicating that the royalty is calculated based on processed gas at a point downstream rather than gas produced at the well. Nor does the deed specify that the royalty is based on gross proceeds from a downstream sale. The term "free of cost forever" in the deed restates the rule that the royalty is calculated without deduction of costs incurred in exploring for and producing the minerals. Standing alone, the phrase does not transform

---

[1] *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 347 (Tex. 2023) ("[T]o make a royalty free of postproduction costs, a lease could change the point at which it was valued or specify that something would be added to the royalty base." (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 131 (Tex. 1996) (Owen, J.) (plurality op.))).

2

a royalty on raw minerals into a royalty on processed minerals sold downstream as products.

## I

B. A. Puig, Jr., the Puigs' predecessor in interest, reserved a nonparticipating royalty interest when he sold Webb County ranchland to Palafox Exploration Company in 1960 (the "Puig Deed").[2] The deed provides:

> There is SAVED, EXCEPTED AND RESERVED, in favor of the undersigned, B. A. Puig, Jr., out of the above described property, an undivided one-sixteenth (1/16) of all the oil, gas and other minerals, except coal, in, to and under or that may be produced from the above described acreage, to be paid or delivered to Grantor, B. A. Puig, Jr., as his own property free of cost forever. Said interest hereby reserved is Non-Participating Royalty . . . .

Fasken Oil and Ranch, Ltd.,[3] the successor in interest to Palafox Exploration Company, operates oil and gas wells on the relevant leaseholds. After Fasken produces minerals from the wells, it transports, treats, processes, and sells them as condensate and natural gas. Fasken historically deducted the costs incurred between the wellhead and the point of sale from the price obtained for the processed gas to arrive at a market value used to calculate the Puigs' royalty on the produced minerals.

---

[2] The Puigs include Baldomero A. Puig, III, Emily P. Kenna, James W. Puig, and Priscilla P. Oberton.

[3] In addition to Fasken Oil and Ranch, Ltd., petitioners include Fasken Land and Minerals, Ltd., and Fasken Management, LLC, as General Partner of Fasken Oil and Ranch, Ltd., and Fasken Land and Minerals, Ltd.

In 2021, the Puigs challenged this calculation and sued Fasken. The Puigs sought a declaration that their royalty is free of downstream postproduction costs, meaning it is calculated based on the sales price obtained for enhanced minerals at a downstream market rather than the market value of the raw minerals when produced. Fasken responded that the Puigs' royalty is calculated based on the value of gas "produced from the above described acreage," not a downstream sales price.

The trial court granted summary judgment for the Puigs, ruling that the royalty is calculated free of postproduction costs with the exception of severance taxes, which the Puigs concede they bear. The trial court also certified an interlocutory appeal on a controlling question of law: "Does the [deed's] 'free of cost forever' language preclude the deduction of post-production costs?"[4]

The court of appeals accepted the appeal and affirmed.[5] Relying on *Chesapeake Exploration, L.L.C. v. Hyder*,[6] the court concluded that "free of cost forever" expresses an intent to free the royalty of downstream costs for determining the market value of the produced minerals.[7]

We granted Fasken's petition for review.

---

[4] *See* Tex. Civ. Prac. & Rem. Code § 51.014(d).

[5] 726 S.W.3d 499, 506 (Tex. App.—San Antonio 2024).

[6] 483 S.W.3d 870 (Tex. 2016).

[7] 726 S.W.3d at 505–06.

4

## II

Fasken contends that the deed establishes a valuation based on minerals "produced from the above described acreage;" that is, the value of the minerals at the wellhead. The Puigs respond that the royalty is calculated based on a downstream sales price that, while not specified in the lease, is implied by the "free of cost forever" language and, in their view, the absence of any specific valuation point for the produced minerals.

The parties presented their competing positions in cross motions for summary judgment.[8] When a trial court denies one cross motion and grants the other, "we review both, determine all questions presented, and render the judgment the trial court should have rendered."[9] We construe the deed as a whole to ascertain the parties' intent and attempt to harmonize provisions so none are rendered meaningless.[10] We give terms their "plain, grammatical, and ordinary meaning unless doing so 'would clearly defeat the parties' intentions' or the instrument shows the parties used the terms in a different or technical sense."[11]

---

[8] We review the trial court's summary judgment ruling construing the parties' deed de novo. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022).

[9] *Id.*

[10] *Id.* at 689–90.

[11] *Id.* at 690 (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019)).

## A

A nonparticipating royalty is a nonpossessory interest that "entitles its owner to a share of the production proceeds, free of the expenses of exploration and production."[12] Unless the parties agree otherwise, a nonparticipating royalty is subject to postproduction costs incurred to prepare raw oil or gas for sale downstream, "including taxes, treatment costs to render [the minerals] marketable, and transportation costs."[13] This is because "[t]he value of gas 'at the well' represents its value in the marketplace at any given point of sale, less the reasonable cost to get the gas to that point of sale."[14] To deviate from this general rule, a royalty agreement must "'plainly and in a formal way' express[] [the parties'] intent . . . to 'operate differently.'"[15]

---

[12] *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 527 n.17 (Tex. 2024) (quoting *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex. 1995)).

[13] *Heritage Res.*, 939 S.W.2d at 122 (Baker, J.); *see also Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) (discussing costs to prepare produced minerals for sale).

[14] *See Heritage Res.*, 939 S.W.2d at 130 (Owen, J.) (plurality op.); *see also BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 388–89 (Tex. 2021) (stating that the "workback method" is a proxy for market value at the wellhead in the absence of directly comparable sales); *id.* at 388 n.29 (explaining how, on rehearing, the concurring opinion became the plurality opinion and the majority opinion became a concurring opinion).

[15] *Devon*, 668 S.W.3d at 346 (quoting *Wenske v. Ealy*, 521 S.W.3d 791, 797 (Tex. 2017)).

We have recognized two primary ways parties may free a royalty interest from the postproduction costs it usually bears.[16] The first is by setting the valuation point of the royalty downstream of the well.[17] The second is by employing explicit terms that add some or all postproduction costs to the royalty base.[18] This deed does neither.

We start with the valuation point. The Puig Deed describes a geographic location: minerals "produced from the above described acreage." "[T]o 'produce' is to make or create a product that did not previously exist, and not to refine or improve a product already in existence."[19] As the Court has explained, "[p]roduction is the process of bringing minerals to the surface, and production for raw gas occurs at

---

[16] *Id.* at 347 (citing *Heritage Res.*, 939 S.W.2d at 131 (Owen, J.) (plurality op.) (discussing ways to deviate from the usual allocation of postproduction costs)). In recognizing these methods, we do not foreclose others.

[17] *See, e.g.*, *id.*; *Randle*, 620 S.W.3d at 391 ("[R]oyalties computed on gross amounts received means royalties are paid based on point-of-sale proceeds without deduction of postproduction costs."); *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 245 (Tex. 1981) ("If the parties intended royalties to be calculated on the amount realized standard, they could and should have used only a 'proceeds-type' clause.").

[18] *See Devon*, 668 S.W.3d at 347–48 (interpreting a lease to require postproduction costs enumerated in the lease to "be added to the . . . gross proceeds" royalty base).

[19] Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 St. Mary's L.J. 1, 89 (2005) (citing *Produce*, Webster's New World Dictionary (3d college ed. 1988); *Produce*, Black's Law Dictionary (5th ed. 1979)).

the wellhead."[20] Although parties to a deed can set the valuation point and the valuation method independently, absent contrary language, a royalty in minerals "produced" and nothing more is a royalty valued at the well.

Not only is the valuation location in this case geographically distinct, so is the type of gas.[21] A royalty in "produced," unprocessed minerals free of costs contrasts with a royalty in "processed" or enhanced minerals. "The market price of the processed gas reflects the value of the unprocessed gas at the well only if reasonable postproduction processing costs are deducted."[22] A royalty on processed gas, in contrast, "share[s] in the enhanced value of production but not the expenses incurred to make it so."[23]

---

[20] *Randle*, 620 S.W.3d at 386–87; *see also Middleton*, 613 S.W.2d at 244 ("Production means actual physical extraction of the mineral from the land."); Keeling & Gillespie, *supra*, at 88 (stating that "'production' ceases once the [operator] extracts oil or gas from the ground at the wellhead").

[21] *See Carl v. Hilcorp Energy Co.*, 689 S.W.3d 894, 896 (Tex. 2024) (stating that a royalty interest in minerals at the well is in "minerals as they come out of the ground"); *see also Heritage Res.*, 939 S.W.2d at 129 (Owen, J.) (plurality op.) ("Market value 'at the well' means the value of gas at the well, before it is transported, treated, compressed or otherwise prepared for market."); *id.* at 130 (citing *Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 231 (5th Cir. 1984) ("'At the well' therefore describes not only location but quality as well.")).

[22] *Burlington Res.*, 573 S.W.3d at 203–04 (quoting *French v. Occidental Permian Ltd.*, 440 S.W.3d 1, 3 (Tex. 2014)).

[23] *Devon*, 668 S.W.3d at 336–37; *see also Danciger Oil & Refineries, Inc. v. Hamill Drilling Co.*, 171 S.W.2d 321, 322 (Tex. 1943) (distinguishing gas "if, as and when produced" from gas after "it ha[s] been processed into a product of a higher value").

We interpreted similar "produced" language in *Carl v. Hilcorp Energy Co.*, in which we concluded the deed calculated a royalty on "gas . . . produced from said land and sold or used off the premises" based on the value of the gas at the well.[24] The disputed deed in *Carl* included a "market value at the well" term unlike the deed in this case.[25] The "produced from the above described acreage" in the Puig Deed, however, is functionally equivalent to the at-the-well term in *Carl*: it identifies "the physical spot at which [the Puigs'] interest in the products arises,"[26] indicating "that the royalty interest is in the minerals as they come out of the ground, not after . . . 'post-production' efforts have increased the minerals' value."[27]

The Puig Deed contrasts with agreements calling for a valuation away from the wellhead that employ terms it critically lacks. In *BlueStone Natural Resources II, LLC v. Randle*, we explained that "gross proceeds" language differs from an at-the-well valuation point or a net-proceeds measurement.[28] A deed calling for valuation based on the "amount realized," "proceeds," "gross value received," or another

---

[24] 689 S.W.3d at 897.

[25] *Id.*

[26] *Burlington Res.*, 573 S.W.3d at 207; *see also id.* at 211 (interpreting "agreements [that] provide that the royalty interest shall be delivered 'into the pipelines, tanks, or other receptacles with which the wells may be connected'" to fix valuation at "the physical spot where the interest must be delivered—at the wellhead or nearby").

[27] *Carl*, 689 S.W.3d at 896.

[28] 620 S.W.3d at 391.

9

gross-proceeds term is "based on point-of-sale proceeds."[29] Absent limiting language, such terms may create a royalty free from postproduction costs.[30]

"Produced from the above described acreage" is the opposite of a term that sets the valuation at a downstream point. While minerals must be produced regardless of a royalty interest valuation point, in the absence of language calling for a royalty on transported, processed, treated, or otherwise enhanced minerals downstream, a royalty on minerals "produced" is a royalty valued at the wellhead.

The term "free of cost forever" does not change the valuation point or formally relieve the royalty of any postproduction costs incurred to enhance the value of the produced minerals. "Forever" refers to the temporal duration of the royalty interest, not to the geographic location of valuation.[31] We have said that language similar to the "free of cost forever" language in this deed does "nothing to change the valuation point,"[32] much less to a location where the enhanced minerals are sold. When a royalty provision calls for valuation at the well, a cost-free term does not free a royalty of postproduction costs because such costs are not

---

[29] *Id.* at 389–91. This language can be modified by other terms, such as "net" or "at the well," that may require the lessor to bear postproduction costs. *Id.*

[30] *Id.*

[31] *See Hancock v. Butler*, 21 Tex. 804, 817 (1858) (stating that "forever" is "a word of time"); *Forever*, American Heritage Dictionary (1st ed. 1969) ("1. For everlasting time; eternally.").

[32] *Devon*, 668 S.W.3d at 347 (citing *Heritage Res.*, 939 S.W.2d at 130–31 (Owen, J.) (plurality op.)).

incurred to produce the minerals.[33] This is true even when the cost-free term refers to specific postproduction costs, like the clause in *Heritage Resources, Inc. v. NationsBank*, which expressly stated "there shall be no deductions from the value of Lessor's royalty [for] processing, cost of dehydration, compression, transportation or other matter to market such gas."[34] Absent reference to another valuation point or calculation method in the deed, cost-free language merely restates the rule that a royalty interest is free of costs incurred in exploring for and producing the raw minerals.[35]

For the same reason, "free of cost forever" does not "'plainly and in a formal way' express[] [the parties'] intent" to reallocate postproduction costs.[36] This general reference emphasizes that the reserved royalty interest is free of *production* costs. The Puig Deed employs language traditionally used to create a mineral interest, and the cost-free term in the granting clause distinguishes the royalty interest reserved from a mineral interest that typically bears such costs.

---

[33] *See id.* (explaining that anti-deduction language does not relieve a royalty valued at the well of postproduction costs "for the simple—and mathematical—reason that there aren't any postproduction costs to 'deduct' when value is determined at the well"); *see also Randle*, 620 S.W.3d at 393 n.64 ("[N]o-deductions provisions have been construed as surplusage with respect to royalties valued at the well . . . .").

[34] 939 S.W.2d at 130 (Owen, J.) (plurality op.).

[35] *See, e.g.*, *Hyder*, 483 S.W.3d at 873–74 (explaining that cost-free language is commonly used to "simply emphasize that the . . . royalty is free of production costs").

[36] *Devon*, 668 S.W.3d at 346 (quoting *Wenske*, 521 S.W.3d at 797).

The Puig Deed provides for a royalty on minerals "in, to and under or that may be produced from the above described acreage." We interpreted a similar phrase in *Temple-Inland Forest Products Corp. v. Henderson Family Partnership, Ltd.*[37] The deed in that case, much like the deed here, had a granting clause reserving an interest "in, to and of all oil, gas, and other minerals . . . that may be produced from the following described land."[38] We observed this language ordinarily creates a mineral interest,[39] but "free of cost" language elsewhere in the deed indicated the parties' intent to convey a royalty interest, not a mineral interest.[40] "[F]ree of cost forever" clarifies the grantor's reservation of a royalty free of production costs, rather than a mineral

---

[37] 958 S.W.2d 183 (Tex. 1997).

[38] *Id.* at 184 (alteration in original).

[39] *Id.* at 185 (citing *Watkins v. Slaughter*, 189 S.W.2d 699, 700–01 (Tex. 1945), and *Altman v. Blake*, 712 S.W.2d 117, 117–18 (Tex. 1986)); *see also Altman*, 712 S.W.2d at 117–18 (explaining that a deed conveying "a 1/16 interest in and to all of the oil, gas and other minerals in and under and that may be produced from said land" denotes a mineral interest); Ernest E. Smith & Jacqueline L. Weaver, 1 Texas Law of Oil and Gas § 3.5(A) (2025) ("The traditional language used to create a mineral fee is a reference to the oil, gas, and other minerals 'in, on, and under' or 'in and under' the described land.").

[40] *Temple-Inland*, 958 S.W.2d at 186. In *Wintermann v. McDonald*, the Court interpreted "free royalty" in a statute to conclude the State, in granting land, reserves a royalty interest, not a mineral interest. 102 S.W.2d 167, 173 (Tex. 1937). Unlike private leases, public leases conveyed by the State are "construed strictly in favor of the State." *Magnolia Petrol. Co. v. Walker*, 83 S.W.2d 929, 934–35 (Tex. 1935) (quoting *Empire Gas & Fuel Co. v. State*, 47 S.W.2d 265, 272 (Tex. 1932)). This rule does not apply to mineral conveyances between private parties. *Schwarz v. State*, 703 S.W.2d 187, 189 (Tex. 1986).

12

interest burdened by them, in deed language that could be construed as creating either.

The Puigs urge that their deed identifies the interest as a "Non-Participating Royalty Interest," which sufficiently distinguishes their interest from a mineral interest without cost-free language. As we have recognized, however, drafters often use cost-free language to stress that an agreement conveys a royalty interest free of production costs.[41] "[F]ree of cost forever" restates the rule that the royalty is free of the costs of exploring for and producing the minerals. The Puigs' construction of the language "would improperly convert the royalty interest from a royalty on raw products at the well to a royalty on refined, downstream products."[42] We cannot rewrite or add to the deed to reach such a result.[43]

The deed's in-kind provision further supports the construction that "free of cost" refers to exploration and production costs when valuing the minerals "produced from the above described acreage." The royalty in the Puig Deed is "to be paid or delivered," meaning that it can be paid in cash or delivered in kind at the well.[44] But the deed does not

---

[41] *Hyder*, 483 S.W.3d at 873–74.

[42] *Burlington Res.*, 573 S.W.3d at 205.

[43] *See Nettye*, 639 S.W.3d at 695 ("[W]e cannot rewrite or add to [an] instrument under the guise of interpretation.").

[44] *See Myers-Woodward LLC v. Underground Servs. Markham, LLC*, 716 S.W.3d 461, 473 (Tex. 2025) ("Deed language contemplating delivery of the production to the royalty holder creates an in-kind royalty."). A royalty owner

designate who chooses between the two alternatives. In *Hyder*, we allowed a cash royalty to be free of postproduction costs even if the royalty in kind bears them, noting that the royalty owner in that case held the right to choose between the two.[45] As we more recently observed in *Burlington Resources Oil & Gas Co. v. Texas Crude Energy, LLC*, however, it would be strange for parties to contract for the value of the royalty to turn on the method of delivery.[46]

Unlike the agreements in *Hyder* and *Burlington Resources*, the Puig Deed does not grant the Puigs the right to choose between a cash or an in-kind royalty. If the royalty is free of postproduction costs when paid in cash but not when delivered in kind, the Puigs have every incentive to choose a cash royalty.[47] Fasken, in contrast, has every incentive to choose to deliver the royalty in kind, avoiding the penalty for enhancing the value of the raw minerals postproduction.[48] A contract

---

who receives a royalty in kind is entitled to the owner's share of the minerals produced as an alternative to the share's cash value. *See Nettye*, 639 S.W.3d at 684, 685 n.5.

[45] *Hyder*, 483 S.W.3d at 872 (interpreting "each Lessor has the continuing right and option to take its royalty share in kind"); *id.* at 875 (stating that if the royalty owner chooses to take their royalty in kind, they "might use the gas on the property, transport it themselves to a buyer, or pay a third party to transport the gas to market").

[46] 573 S.W.3d at 210–11 (reasoning that it would be odd for parties to intend for an at-the-well provision to apply only to in-kind delivery because the royalty value would turn on the method of delivery and the operator "would be penalized for . . . post-production enhancements" if the royalty is paid in cash).

[47] *See id.* at 211.

[48] *See id.*

14

that permits either party to manipulate the price via the method of delivery without establishing who chooses the method is far less plausible than a contract that, by fixing valuation of the royalty based on minerals produced at the wellhead, provides for a royalty of equal value regardless of the method of delivery. Parties are "free to contract for . . . odd results,"[49] but we will not reach to find them outside the text of the deed.

Finally, though our construction turns solely on the deed's text,[50] we note that the parties' uniform course of conduct is consistent with our reading of the deed's language. The Puigs do not dispute that their royalty payments have historically been burdened by postproduction costs. This "seem[s] normal and reassuring" in light of our interpretation of the text.[51]

## B

The court of appeals relied on the Court's opinion in *Hyder* to reach its conclusion that the "free of cost forever" language in the Puig Deed includes postproduction costs. This phrase, plucked from its context, ignores the Court's holistic analysis of the *Hyder* lease. In *Hyder*, the lease at issue contained three royalty provisions. From the outset, we noted the general rule that "a royalty is free of production

---

[49] *Id.*

[50] *See id.* at 206 ("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine [their] meaning.").

[51] *Clifton v. Johnson*, ___ S.W.3d ___, 2026 WL 705763, at *5 (Tex. Mar. 13, 2026) ("It would be surprising for parties to misinterpret (or disregard) their own legal instrument from the very beginning.").

expenses but 'usually subject to post-production costs.'"[52] Applying this general rule to the first two royalty clauses in the lease, we concluded: (1) the oil royalty was burdened by postproduction costs because it was paid based on market value at the well; and (2) the gas royalty was free of postproduction costs because it was paid based on "the price actually received" by the operator.[53] We then turned to the third royalty clause, calling for "'a perpetual, cost-free (except only its portion of production taxes) overriding royalty of five percent (5.0%) of gross production obtained' from directional wells."[54]

While we agreed that "cost-free" may "literally refer[] to all costs,"[55] that phrase alone does not free a royalty of postproduction costs because it says nothing about a valuation point. To the contrary, we acknowledged that cost-free language commonly refers to production costs only.[56] It was the lease's additional language in *Hyder* that provided crucial context to the "cost-free" term. Most notably, the royalty provision contained a parenthetical exempting "production taxes" from

---

[52] *Hyder*, 483 S.W.3d at 872 (quoting *Heritage Res.*, 939 S.W.2d at 121–22) (Baker, J.)).

[53] *Id.* at 871–72, 873. Language stating that the gas royalty was "free and clear of all production and post-production costs and expenses" had "no effect on the meaning of the provision" because the "price actually received" language—not the anti-deduction language—changed the valuation point to the point of sale. *Id.* at 872–73.

[54] *Id.* at 872.

[55] *Id.* at 874.

[56] *See id.* at 873–74.

16

the "cost-free" term.[57] This exemption, we concluded, showed the parties' intent to deviate from the general rule.[58] Because the Court characterized the taxes as a postproduction cost, "[i]t would make no sense to state that the royalty is free of production costs, except for postproduction taxes."[59] As the Court put it, such a reading is akin to stating "no dogs allowed, except for cats."[60] Having concluded that the parenthetical reflected the parties' intent to free the royalty from other kinds of postproduction costs, the Court considered the remaining language of the royalty provision. "[G]ross production obtained" addressed the volume used to value the royalty, not the valuation point.[61] And because the royalty owner retained the right to choose the method of delivery (and its consequences), the in-kind provision did not overcome the specific exclusion of one postproduction expense as an indication that others were to be included.[62]

In contrast, the Puig Deed contains no reference to postproduction expenses indicating the parties intended "free of cost forever" to reallocate postproduction costs or to base the royalty on an

---

[57] *Id.*

[58] *Id.* at 874.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 874–75 (stating that "gross production" refers to "the entire amount of gas produced, including gas used by [the operator] or lost in postproduction operations").

[62] *Id.* at 872, 875.

17

unspecified sales price for *processed* gas as opposed to the stated royalty on *produced* gas. The deed does not include other royalty clauses employing downstream valuation points, nor does it expressly grant the royalty owner the right to elect whether to take the royalty in cash or in kind. Unlike the lease in *Hyder*, this deed reserves a royalty on minerals produced at the well where "there aren't any postproduction costs to 'deduct.'"[63]

*   *   *

The Puig Deed restates the rule that a royalty is free of costs incurred in exploring for and producing minerals. It reserves a nonparticipating royalty in minerals produced at the well that bears the usual postproduction costs. We hold that the "free of cost forever" language refers to raw minerals produced at the wellhead, not to processed minerals sold downstream. Thus, it does not preclude deduction of postproduction costs from a downstream sales price to arrive at the market value of raw minerals produced at the wellhead. Accordingly, we reverse the judgment of the court of appeals, render partial summary judgment for Fasken, and remand the case to the trial court for further proceedings consistent with this opinion.

Jane N. Bland
Justice

**OPINION DELIVERED:** April 10, 2026

---

[63] *Devon*, 668 S.W.3d at 347.

18