RAILROAD COMMISSION of Texas et al., Appellants,

v.

AMERICAN TRADING AND PRODUCTION CORPORATION, Appellee.

No. 10663.

Court of Civil Appeals of Texas.

Austin.

April 1, 1959.

Rehearing Denied April 22, 1959

Will Wilson, Atty. Gen., James N. Ludlum, First Asst. Atty. Gen., Houghton Brownlee, Jr., Asst. Atty. Gen., Rayburn L. Foster, Harry D. Turner, Bartlesville, Okl., Carl W. Jones, Midland, Wallace H. Scott, Jr., Austin, Raymond A. Lynch, Midland, for appellants.

Frank C. Ashby, Midland, Harry S. Pollard, Austin, for appellee.

HUGHES, Justice.

Appellee American Trading and Production Corporation, hereinafter called American, sued the Railroad Commission of Texas and its members, in the nature of a statutory appeal, to vacate an order of the Commission denying American's application for a permit to drill a well on a 160 acre tract, being the NW/4 of Section 29, Blk. 38, Township 2 South, T. & P. Ry. Co. Survey, in Midland County. The tract is in the Azalea (Strawn) gas field in such county and the well was sought as an excep-

tion, on the ground of confiscation only,[1] to the Commission's statewide density order and special field rules which prohibit the drilling of a gas well on less acreage than a 640 acre proration unit.

Appellants Murphy H. Baxter, Joseph I. O'Neill, Jr. and Phillips Petroleum Company, owners of offset leases, intervened in the Trial Court and are aligned with the Commission.

Upon a nonjury trial final judgment was rendered setting aside the order of the Commission and enjoining· it from interfering with American in drilling the well in accordance with its application.

The validity of this judgment depends upon the existence of the 160 acre tract upon which the well was to be drilled as a separate tract prior to the time the 640 acre density rule of the Commission became applicable to the area in which the tract is located.

It is the contention of appellants that the 160 acre tract was subdivided (separated from a 320 acre tract) subsequent to the effective date of the density rule and hence such subdivision is illegal and will not support the sought for exception on the ground of confiscation.[2] This was also the ground upon which the Commission denied the permit to drill.

The facts which control the outcome of this appeal follow:

Section 29, supra, containing 640 acres of land was owned in fee in undivided interests by members of the Heidelberg family in September 1954. In September and November of that year American became the owner of the 7/8ths mineral leasehold estate in the section under eight oil and gas leases each lease covering an undivided interest in the entire section.

Since the execution of these leases there has been no change in the fee title to Sec. 29 or in the 1/8th royalty interest reserved by such leases.

· On October 31, 1955, when statewide spacing Rule 37 provided regular 20 acre drilling· units American and Murphy H. Baxter entered into an agreement whereby American agreed to assign to him, upon completion of a test well, certain leasehold interests including such interests in four alternate 80 acre portions of Section 29. Upon completion of such well assignments were made (March 29, 1956) as agreed and thereafter Baxter assigned certain undivided leasehold interests to various persons.

On November 1, 1956, Baxter and his assigns entered into an exchange assignment and agreement with American as a result of which the Baxter group became the owner of the leasehold interest covering the NE/4 and the SW/4 of Section 29 and American became the owner of the leasehold interest covering the NW/4 and the SE/4 of Section 29.·

On November 12, 1956, American made a farm-out agreement with Joseph I. O'Neill, Jr., whereby O'Neill obligated himself to drill to completion a test well on the NW/4 of Section 30, Block 38, T–2–S, T. & P. Ry. Co. Survey, which agreement provided:

"Confirming our recent discussions, this letter will constitute our bottom-hole agreement regarding a test well for oil and/or gas which you hereby obligate yourself to drill at a well site located in the approximate center of the NW/4 of Section 30, Block 38, T–2–S, T. & P. Ry. Co. Survey, in · Midland County, Texas, on a 160-acre tract of land which we are farming-out to you under this agreement.

---

1. Only legal confiscation as distinguished from factual confiscation as a result of drainage is involved here.

2. The density rule applicable here incorporates the provisions of spacing Rule 37 of the Commission pertaining to the subdivision of property the effect of which is to disregard in determining the issue of confiscation any subdivision of property made after the spacing rule has become effective.

"1. You agree to commence actual drilling at the above described well location on or before November 30, 1956, and to diligently continue the drilling of said well without interruption and in a good and workmanlike manner until you have drilled and tested to a total depth from the surface of at least 10,500 feet, unless you have established commercial production of oil and/or gas, or have tested a conclusive volume of salt water, at a lesser depth in the Strawn (Pennsylvanian) Limestone formation. It is further understood and agreed that the drilling and completion of said well shall be a firm obligation undertaken at your sole risk, cost and expense, and said well shall be completed either as a commercial producer or finally plugged and abandoned as a dry hole on or before March 1, 1957.

"2. Within fifteen (15) days after receipt and acceptance by us of final well data showing that the aforesaid well has been completed either as a commercial producer or finally plugged and abandoned as a dry hole, as herein provided, we agree to execute and deliver an assignment or assignments to you of all our rights, title and interest in and to the oil, gas and mineral leases on the following described tracts of land in Midland County, Texas, to-wit:

"The NW/4 and the SE/4 of Section 30, and the NW/4 and the SE/4 of Section 29, Block 38, Township 2 South, T & P RR Co. Survey, * * *.

"The aforesaid assignment or assignments, and the delivery thereof to you, shall be subject to all of the terms and conditions of this agreement and of the basic leases concerned and will further provide that you shall pay all delay rentals which may thereafter become due under your portion of the above described oil and gas leases until such time as you shall give notice as provided in Paragraph 10 hereof of your intention to permit your portion of said leases to lapse in whole or in part and tender a reassignment to us;

"Save and except, that said assignment or assignments shall reserve unto Assignor, American Trading and Production Corporation, its successors and assigns, an overriding royalty of $\frac{3}{8}$ths of $\frac{8}{8}$ths of all the oil, gas and other minerals produced and saved from said lands under the terms of the basic leases or any renewals or extensions thereof, free of all costs, except taxes; and, save and except that the overriding royalty reserved unto Assignor on all the oil, gas and other minerals that may be obtained from any formation shallower than a total depth of 9,000 feet from the surface shall be reduced to $\frac{1}{8}$th of $\frac{7}{8}$ths of the total amount produced and saved by natural flow, and further shall be reduced to $\frac{1}{16}$th or $\frac{7}{8}$ths of the total amount produced and saved as to such portion or portions of the total production as may be obtained by pumping or other artificial lifting methods.

"3. Furthermore, it is understood and agreed that within one hundred twenty (120) days after said first well has been drilled and completed either as a commercial producer or has been finally plugged and abandoned as a dry hole, as herein provided, you shall commence the actual drilling of a second test well on another of the four 160-acre tracts of land hereinabove described, and thereafter a third test well, and so on, with not more than one hundred twenty (120) days elapsing between the completion of one well and the commencement of another, until the above described tracts of land shall have been explored and developed to the density of one well to each 160 acres of land, more or less, all of which wells shall be drilled and tested in the same manner and to the same ultimate

depth as herein set forth as regards the first test well;

"Provided, however, that should you fail to commence said second test well, or any subsequent test wells within the period of time allowed, you agree to forthwith reassign to us the oil, gas and mineral lease or leases on all of the remaining undeveloped 160-acre tracts of land hereinabove described, said reassignment to cover the full working interest under said tracts as originally assigned to you by us, retaining for yourself only each producing well and the 160 acres of land, more or less, surrounding such well. * * *

"In the event that you, or your successors or assigns, should elect to allow your portion of the above described oil and gas leases to lapse in whole or in part by the nonpayment of any delay rentals which may become due thereunder after you have acquired title thereto and before any commercial production has been established thereon, or, in the event that during the last year of the primary term of said lease you, or your successors or assigns, shall not be producing oil or gas from the above described lands, and should elect not to drill thereon and said oil and gas leases would thus expire and terminate by virtue of lack of production, then and in either of such events it is agreed that you, or your successors or assigns, at least ninety (90) days before the due date of the next maturing delay rental or before expiration of the primary term of said leases, as the case may be, shall notify American Trading and Production Corporation in writing of your intentions to permit your portion of said leases to lapse or expire in whole or in part and shall tender to American Trading and Production Corporation for acceptance

or rejection an assignment or assignments in the same form and with the same covenants as the assignment or assignments made by American Trading and Production Corporation covering the full interest under oil or such portion of the said oil and gas leases as would so lapse or expire."

In compliance with this agreement O'Neill drilled a test well on the NW/4 of Section 30 which was a dry hole.

Pursuant to its obligations under this agreement American on March 21, 1957, assigned to O'Neill the leases covering the NW./4 and SE/4 of Section 29. This assignment contained the following language:

"Provided That in accordance with the terms and provisions of that certain farm-out agreement dated November 12, 1956, by and between assignee and assignor herein, assignee will drill or cause to be drilled a second, third and fourth well on said land in the manner and within the time intervals as set out in the aforesaid agreement. Should assignee fail to commence said second test well, or any subsequent test wells thereafter within the period of time prescribed in said farm-out agreement, then and in that event, assignee shall forfeit all rights, title and interest in and to the undeveloped acreage assigned herein and shall forthwith reassign to assignor the oil, gas and mineral leases on all the undeveloped acreage retaining only each producing well and 160 acres of land surrounding each producing well."

Subsequently, August 9, 1957, O'Neill completed a producing gas well on the SE/4 of Section 29. He was obliged then, under his agreement, to commence an additional well within 120 days from August 9, 1957. This he did not do; nor was such well commenced within a thirty day extension of time granted by American.[3]

3. O'Neill's affidavit appears in the record and in it he states:
"that on December 6, 1957, affiant made a motion to the Texas Railroad Com-

mission for a rehearing in the matter of 640-acre proration units in the Azalea Field, which motion was denied by

On November 21, 1957, the Commission adopted field rules for the Azalea (Strawn) field in which the involved lands are located and prescribed a 640 acre proration unit.

On January 22, 1958, O'Neill, in accordance with the farm-out agreement, reassigned to American the leases on three of the 160 acre tracts including the lease on the NW/4 of Section 29, O'Neill retaining the productive lease on the SE/4 of Section 29.

On May 6, 1958, American filed its application for a permit to drill on its reassigned lease covering the NW/4 of Section 29 and it is the action of the Commission in refusing this application that is the subject of this suit and appeal.

We sustain the action of the Commission. It is our opinion that O'Neill was vested with the title to the leasehold interests covering the SE/4 of Section 29 and the NW/4 of Section 29 when, on January 22, 1958, he conveyed by way of reassignment the leasehold interest covering the NW/4 of Section 29 to American. This assignment constituted an illegal subdivision under the density rule then applicable to the area in which the land was located.

Our conclusion is based upon what we consider to be a proper construction of the farm-out agreement between American and O'Neill from which we have quoted herein.

The position of American is stated in its brief:

" * * * appellee submits that the judgment of the Trial Court herein is correct because the NW/4 of Section 29 constitutes a 160-acre separate tract for oil and gas development, inasmuch

the Texas Railroad Commission on December 9, 1957;
"that affiant's sole purpose in requesting and obtaining such extension of time in which to commence said third well was to await the outcome of the aforementioned motion for rehearing, and that although affiant was desirous of drilling a well to test the Strawn Limestone forma-

as: ' (a) O'Neill did not acquire legal title to that tract, the letter agreement and the assignment of March 21, 1957, being in the nature of an option to O'Neill by which he could acquire legal title only if and when he completed a producing well thereon within the specified time-limit; * * *.

"In the language of the courts and the writers, the basic question to be determined is whether O'Neill's obligation to commence drilling each well within 120 days was a condition precedent, or a condition subsequent."

We construe the farm-out agreement as vesting in O'Neill title to the leasehold estates assigned to him upon completion of the first well subject to divestment upon nonperformance of the stated conditions. There are several rules, laid down by the courts, which have enabled, as well as required, us to reach this conclusion.

■ A deed will be construed to confer upon the grantee the greatest estate that the terms of the instrument will permit. Waters v. Ellis, 312 S.W.2d 231, Supreme Court.

■ If the act does not necessarily precede the vesting of the estate, but may accompany or follow it; if this is to be collected from the whole instrument, the condition is subsequent. Bell County v. Alexander, 22 Tex. 350, 351.

Where there have been other considerations performed or paid and the act in question is not the sole consideration for the conveyance, a condition subsequent is imported. 12 Tex.Jur. 126, 127; Manton v. City of San Antonio, Tex.Civ.App., San Antonio, 207 S.W. 951, writ ref.

tion located in the Northwest Quarter (NW/4) of Section 29, Block 38, T-2S, T & P Ry. Co. Survey, affiant was advised by counsel that it was impossible to do so under the existing field rules and in view of the Texas Railroad Commission's denial of the motion for rehearing; * * *."

Where the grantee is entitled to the possession and use of the property, a condition subsequent is implied. 4 Thompson on Real Property (Permanent Ed.) Sec. 2033, p. 557.

■■ Applying these principles to the farm-out. agreement it is evident that the agreement to drill wells two, three and four failing in which undeveloped tracts were to be reassigned to American emerges as a condition subsequent, which is a more favored estate than a condition precedent.

The delivery of the four leases, as provided in the farm-out agreement, was conditioned upon performance of the obligation to drill the first well. This was an extremely valuable consideration the record showing that the cost of drilling such well was approximately $200,000.

Upon the delivery of the lease assignments O'Neill was entitled to use and possession of the described premises for the purposes named in the leases.

Of course the act of drilling wells other than the first did not necessarily precede the vesting of the mineral estate conveyed by the lease assignments. The agreement specifically provided that such acts should follow at not more than 120 day intervals after delivery of the lease assignments. ,

Other matters which convince us that title vested in O'Neill when the lease assignments were delivered to him are (1) his obligation to pay rentals due under the assigned leases, which obligation is an incident of ownership, (2) the provision in the farm-out agreement that in the event of reassignment by O'Neill "said reassignment to cover the full working interest under said tracts as originally assigned to you by us," and the provision of the agreement to reassign in the event the leases were about to expire because of nonpayment of rentals or failure to develop that such reassignment should be "in the same form and with the same covenants as the assignment" made by American "covering the full interest under all or such portion of said oil and gas leases

as would so lapse or expire" are consistent only with the ownership by O'Neill of the interests described in the assignments made by American to him.  .

We also consider the fact that the parties to the farm-out agreement clearly made the drilling of the first well a condition precedent to the acquisition of any title by O'Neill indicative of the fact that they deliberately and knowingly conveyed title to the four tracts after completion of the well and not a mere ·option for title as appellee contends.  .

Corroborative of this interpretation of the agreement is the language of the assignment executed pursuant to it which provided that should O'Neill fail to commence the second or any subsequent well that he should " * * * forfeit all rights, title and interest in and to the undeveloped acreage assigned herein and shall forthwith reassign the assignor the oil, gas and mineral leases on all the undeveloped acreage. * * * " This is a practical construction of the agreement by the parties and clearly connotes that O'Neill was vested with a title which was subject to forfeiture upon condition.

Appellee places principal reliance upon the case of Spinks v. First Christian Church of Vera, Tex.Com.App., 273 S.W. 815. The deed construed in this case was in the usual form of a conveyance with warranty of title but contained this provision:

"It is agreed by and between the parties hereto that this conveyance is for the use and benefit of the said First Christian Church of Vera, Tex. It is further agreed and understood by and between the parties hereto that in event the said First Christian Church shall fail to erect upon said premises a church building within 24 months from date of this deed that then in that event the title to said premises shall revert to the said W. T. Ward, and this conveyance shall become null

and void. And in event the said Christian Church shall erect said building within said time then in that event the title of the said First Christian Church in and to said tract of land shall become absolute."

In disposing of the case the court said:

"A deed must be construed by reading all of its provisions. They must be made to harmonize in all their provisions, wherever possible. Each clause must be given effect, unless inconsistent the one with the other. Now this deed to the Elders of the Christian Church was in the form of a general warranty deed, except for its provisions already quoted * * * These provisions follow the granting clause and preceded the habendum and warranty clauses in the deed. Those conditional clauses constituted the very essence of the deed. They gave expression to the all controlling purpose of the grantor. Giving effect to this deed, as a whole, the condition was precedent rather than subsequent. * * *

" * * * In other words, the deed was lying dormant until it should be vitalized and given life by the performance of this condition precedent. The deed merely gave to this church this right to acquire title to this lot by doing a certain thing beforehand. It required affirmative action to bring the deed into being. It was not a question of defeating a deed already in force, as must be true in a condition subsequent. * * *

"The deed, with its limitations, is very much like a general warranty deed without limitations, left in escrow to be delivered upon certain conditions precedent. Unless those conditions be performed the deed never becomes effective. No action on the part of the grantor in an escrow deed is necessary to regain his title, where there is a time limit as to when the conditions can be performed. * * *

"We realize that forfeitures of deeds are not favored, and that ordinarily they are construed most strongly against the grantor. That is as it should be. But here we have a different case. We have a deed of gift. All the evidence shows that it was a gift. The giver has a right to fix his own conditions. He fixed but one. There was no effort on the part of the church to comply with it. * * *

"The net result of the ruling of the Court of Civil Appeals is that Ward is deprived forever of his property without having received the sole consideration expressed in the instrument by which he deeded it away. This is manifestly unjust. On the other hand, if the property reverted to Ward, the Christian Church was done no injustice whatever. They had spent nothing on the property. They had slept on their opportunity to acquire title to the land for church purposes. If the judgment of the Court of Civil Appeals is affirmed, the land will likely continue to be used by an individual, for private purposes, without paying compensation to any one therefor. Why should such a judgment be upheld?

* * * * * *

"The parties to the instant deed made their intention perfectly clear. They had in mind no fanciful or technical distinctions about limitations or conditions subsequent. The church was given an option to acquire a 2-acre site by building a house of worship thereon within a certain time. If not so erected, the option would expire, and the trade would be at an end. This being without doubt the intention of the parties, that intention should be given effect."

It seems to us that the Court in Spinks in arriving at the intention of the parties which is the goal in the construction of all instruments was influenced most by the

fact that the deed was a deed of gift the performance of the condition being the sole benefit contemplated by the grantor. Our case is, of course, distinguishable in that a very valuable consideration was paid by the grantee O'Neill for the lease assignments. It is also to be noted that in Spinks the deed provided that it should be a nullity if there was nonperformance of the condition. There is no similar provision in the farm-out agreement. See City of Dallas v. Etheridge, 152 Tex. 9, 253 S.W.2d 640, where Spinks is distinguished. The conveyance there held to be upon condition subsequent is more similar in its terms to those of the farm-out agreement than the one construed in Spinks. The city was given use of the property conveyed and upon breach of stated conditions it was provided that the grantor should have the option to "terminate this grant." This language clearly implies the previous vesting of title and is very similar to the wording of the assignment here that upon violation of the stated conditions assignee should "forfeit all rights, title and interest," which language in our opinion clearly implies the previous vesting of title.

■ If it should appear, although it does not so appear to us, that the language of the farm-out agreement created a doubt as to the nature of the condition contained in it we would be dutybound to hold that it imposed a condition subsequent rather than a condition precedent. Davis v. Skipper, 125 Tex. 364, 83 S.W.2d 318.

■ We turn now to the second and only remaining ground upon which American seeks to sustain the judgment below. This ground is stated as follows:

"* * * the NW/4 of Section 29 was lawfully created as a separate 160-acre tract for oil and gas development on November 1, 1956, by the exchange assignment between Baxter et al. and appellee, and thereafter continuously remained a separate tract although it 'cornered' with the SE/4 of Section 29."

By the November 1, 1956, exchange agreement the Baxter group became the owner of the mineral leasehold on the NE/4 and the SE/4 of Section 29 and American became the owner of the mineral leasehold on the NW/4 and the SE/4 of Section 29.

It will be noted that the NW/4 and the SE/4 have but one point in common, that being the SE corner of the NW/4 and the NW corner of the SE/4.

Rule 2 of the Azalea (Strawn) Field Rules, adopted by the Commission November 21, 1957, provides, in part:

"All such proration units shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of gas."

American's contention here is that these two cornering quarter sections are not continuous and contiguous acreage because they have but a single point in common, a point being "an infinitesimal indication of a position having neither length, breadth or depth."

We are unable to agree with American on this construction of the rule.

Mr. Harry M. Batis, Chief Supervisor of the Oil and Gas Division of the Railroad Commission, testified that he had about fifteen years experience with the Commission in this field and that it had been the uniform practice of the Commission to consider cornering tracts to be "continuing and contiguous" within the meaning of the Commission rules and that there are thousands of fields having rules containing the same language.

It is appropriate to say here that O'Neill American's assignor, so construed the rule as to the very same tracts. After completing a producing well on the SE/4 of Section 29 in August, 1957, he, on December 17, 1957, filed with the Commission a plat and affidavit designating the NW/4 and the SE/4 of Section 29 as a 320 acre proration for gas allowable purposes. This,

of course, was prior to the assignment of the lease on the NW/4 to American on January 22, 1958.

It would not be difficult to imagine the confusion which would result in the industry if we were to adopt American's theory.

We believe the construction placed by the Commission on this rule is correct.

The following cases cited in 9 Words and Phrases, page 94 et seq. hold that tracts which touch only at corners are contiguous: Morris v. Gibson, 35 Ga.App. 689, 134 S.E. 796; Clements v. Crawford County Bank, 64 Ark. 7, 40 S.W. 132, 133; Oregon Mortgage Co. v. Dunbar, 87 Mont. 603, 289 Pa. 559, 73 A.L.R. 113 and Parsons v. Dils, 172 Ky. 774, 189 S.W. 1158.

The same work Vol. 9, page 185 et seq. shows the definition of the word "continuous" as meaning: "connected, extended, or prolonged without separation or interruption, or interruption of sequence; unbroken; unintermitted" has been the subject of judicial approval many times.

We believe that these authorities along with definitions given the words "continuous" and "contiguous" by standard dictionaries as well as their commonly understood meaning demonstrate the correct interpretations of Rule 2, supra, by the Commission.

Whether we view the action of the Commission herein from a strictly legal point of view or whether we appraise it as being reasonable or arbitrary or whether we weigh it under the rule that the applicant for a permit to drill a test well for oil or gas must present a good faith claim for the permit we are convinced that the order of the Commission denying American's application to drill a test well on the NW/4 of Section 29, supra, was valid. So believing the judgment of the Trial Court is reversed and judgment is here rendered that American (appellee) take nothing by its suit or by reason of its appeal from the order of the Commission herein.

Reversed and rendered.